### EDGAR v. CITY OF PITTSBURG.

(Circuit Court, W. D. Pennsylvania. March 13, 1902.)

MUNICIPAL CORPORATIONS—POWER TO CONTRACT FOR PUBLIC IMPROVEMENTS—LIMITATION BY PENNSYLVANIA STATUTE.

Act Pa. March 7, 1901, for the government of cities of the second class, with the supplemental act of June 20, 1901, which together constitute the governing law of cities of such class, vests the power to make contracts in the councils, providing that "no contract shall be let until councils shall have passed an ordinance providing for the letting of the same by the city recorder and head of the proper department." The power of councils with respect to contracts, however, is limited by other provisions, among which is one that "every contract for public improvements shall be based upon estimate of the whole cost, furnished by the proper officer through the department having charge of the improvement and no bid in excess of such estimate shall be accepted." Held, that the obtaining of such estimate by councils covering the whole cost of a proposed public improvement was a condition precedent to the exercise of the power to contract for such improvement, or any part of it, the clear purpose of the act being that the entire probable cost of an improvement should be taken into consideration and deliberated upon before any contract with reference thereto should be made; and that a city had no power to contract for the construction of a part of a filtration plant, in

connection with the extension and improvement of water supply and distribution, where no estimate had been obtained from the proper department of the cost of the improvement when completed, including such accessories and additions to the existing system as the use of such filtration plant proper would render necessary.

In Equity. On final hearing on bill, answer, and replication.

Geo. W. Guthrie and W. B. Rodgers, for complainant.

Clarence Burleigh and Thos. D. Carnahan, for defendant.

BUFFINGTON, District Judge. This is a bill in equity filed by one Edgar, a citizen of Ohio and a property owner in Pittsburg, against said city, to enjoin the letting of a contract for the construction of a portion of a city water filtration plant. The case involves no question as to the wisdom of the city constructing a filtration plant as a whole, nor is issue raised as to the contract price of this particular part thereof, or to the qualification of the proposed bidder. The underlying question is one of law, namely, whether the statutory provisions prerequisite to the city contracting for a public improvement have been complied with. The statute under which the city acts in this regard was but lately passed; and, as new laws suggest new questions, different views exist as to its proper construction. It is to the interest of the contracting parties and a protection to the city's executive officers that the status of the proposed contract should be judicially passed upon before liabilities are incurred thereunder. It is fortunate, moreover, that the case is undisputed as to facts, raises no partisan question, and involves nothing but the purely legal question of such construction. It will be conceded by all that the power of the city of Pittsburg to make a contract—such as here in question—rests upon the act of March 7, 1901, entitled "An act for the government of cities of the second class," and the supplement thereto, approved June 20, 1901. To ascertain the true construction of a law, regard must be had to the object and purpose of its enactment, and, in considering questions of municipal contracting power, the fundamental truth borne in mind that the real principal in a municipal contract is not the city, but the people of the city. As it would be impracticable for them to assemble, deliberate, and contract for municipal work themselves, they cause a corporation—a municipal corporation—to be constituted, in order that their municipal affairs may be transacted through the medium of corporate agency. That such corporate creature is a mere means, and not an end, is shown by the fact that in state and national affairs the state and nation, which are the people, contract without such agency. There is no such corporation as the United States or the commonwealth of Pennsylvania. It will, therefore, be seen that a city, legally and politically considered, is but a corporate agency, created to conveniently transact the municipal affairs of the people who compose it. It therefore follows that, just as in the case of other corporations, the power and authority of the municipal corporation to contract depends on the statutory, charter, or common-law powers thereto enabling it. In transacting municipal affairs, the city necessarily acts by agents, who, with reference to contracts made by the

city, perform legislative or executive duties. As a contract, when made, is an agreement to do a particular thing, the law ascribes to a contracting party knowledge of the subject-matter thereof, deliberation as to the wisdom of making it, and assent to being legally bound by it, and on such basis enforces it. Knowledge, deliberation, and assumption are all implied from the fact that it is an agreement to do a particular thing. It is evident, therefore, that the agent exercising the contracting power of a municipality acts in a legislative capacity. After such legislative agent causes the city to contract, the duty of the executive agent to fulfill such contract attaches. Now, in the delegation of powers to officers of cities of the second class, the act in question vests legislative power in and restricts it to councils, and such power must be exercised by ordinance or resolution. Article 14 provides:

"The legislative power shall be vested in two bodies to be designated as the select and common council. Every legislative act of the councils shall be by resolution or ordinance and every ordinance or resolution, except as hereinafter provided, shall, before it takes effect, be presented, duly engrossed and certified, to the city recorder for his approval. The city recorder shall sign the said resolution or ordinance, if he approves it, or return the same to the branch of council wherein such resolution or ordinance originated within ten days; or at the next meeting of councils after ten days have expired, if he do not approve it, with the reasons therefor; and if, thereupon, each branch of councils pass the same, within five days of such veto, by a vote of three-fifths of all the members elected to each branch, it shall become effective as though the city recorder had signed the same. It shall equally become effective if he should neglect to return the same within such ten days."

Councils, then, being vested with final municipal legislative power (for they can enact over the recorder's veto), it follows they have a right to call on the executive officers of the city to render such aid as shall enable them to properly perform their legislative duties; for the grant of a power carries with it the power to exercise rights necessary to its execution. Such power of councils to call for the aid of executive officers is not dependent on implication. Article 2 provides:

"Each department shall furnish to the * * * councils or either branch of the councils such information as * * * they may at any time demand in relation to its affairs."

Now, while the act makes the recorder and the head of the proper department the signatory officers in behalf of the city to all its contracts, and prohibits the councils from executing the same, stating, "No contracts shall be entered into or executed directly by the councils or any committee thereof," yet the fact remains that councils are expressly vested with the sole power to authorize the letting of a contract, the act providing: "No contract shall be let until councils shall have passed an ordinance providing for the letting of the same by the city recorder and head of the proper department." In view of these provisions, it is clear that the exercise of the contracting power of the city is vested solely in city councils. But the power thus vested is not unlimited. It is coupled with conditions, both as to the scope of the contract and the mode of exercising it within such scope. In

the case of public improvements,—and such description would include an extensive filtration system,—the act provides:

"Every contract for public improvements shall be based upon estimate of the whole cost, furnished by the proper officer through the department having charge of the improvement, and no bid in excess of such estimate shall be accepted. Every such contract shall contain a clause that it is subject to the provisions of this act, and the liability of the city thereon shall be limited to the amount which shall have been or may be, from time to time, appropriated for the same."

As councils are the sole agents to authorize a contract, and as their power to contract for a public improvement is limited to the estimate furnished, it is clear that they are the bodies to which the departmental officer is to furnish the estimate. And as the contract authorized by councils "shall be based upon estimate of the whole cost furnished by the proper officer through the department having charge of the improvement," it is equally clear that, in the absence of such basis for contracting, an attempted contract has no foundation. It must be presumed that the legislature intended a preliminary estimate of cost should be considered by councils before they contracted for a work large enough to be deemed a public improvement. Such course is only to apply to municipal transactions the practice of common business forethought,—a practice so ancient as to have long since been confidently appealed to in the inquiry:

"For which of you, intending to build a tower, sitteth not down first, and counteth the cost, whether he have sufficient to finish it?"

An estimate, then, being the basis on which the contract rests, it would seem that the estimated cost, not of a part, but of the whole proposed improvement, should be submitted to councils. Such, indeed, it appears to us, is the provision of the statute. The estimate is to be made by the department having charge of "the improvement," and "the improvement" is certainly the whole improvement,—is the sum of all the parts necessary to its use as an improvement; less is not "the improvement"; there is to be an estimate of the "whole cost," and the clause has for its subject-matter contracts for "public improvements." Such construction is in accord with the general purpose of the act to vest the exercise of municipal contracting power for public improvements solely in councils. An estimate in accord with this construction enables councils to intelligently pass upon and commit the city to the improvement as a whole, and to outline a systematic and continuous policy in making it. By making such estimate the executive officer places on record the basis of cost on which the councils are induced to contract,—a safeguarding provision which must lead to deliberate and well-considered action on his part; and, councils being restricted in the extent of their contracts to the basis estimate, assume the responsibility of undertaking the improvement on such basis of cost. Under any other construction a department could furnish an estimate of the cost of a part only of some public improvement, and councils, by the adoption of such part, useless in itself without other additions, would place the city in the alternative of spending large sums to make the work undertaken of

any practical use or lose the isolated part unwisely begun. In the absence of express language necessitating such view, we cannot accede to a construction that would sanction a procedure so unbusinesslike and fraught with the possibility of ill-considered expenditure. Indeed it is evident that section 15 was designed as a safeguard against such dangers by subjecting a proposed improvement, in the light of its probable cost, to the light of publicity and the test of general civic opinion. Section 4 provides, "All sessions of council * * * shall be public," and "no ordinance * * * shall be passed finally on the day of its introduction,"—measures which provide time for public opinion to influence councilmanic action. An estimate of the whole cost made to council thus causes the people to face the city's undertaking a public improvement in its entirety. It will then be for the people, who, as we have seen, are the principals in the contract, to determine, through the councils, whether the city shall embark in the undertaking and shall contract. The facts in this case show that the contract in question was not authorized in accordance with the construction here given the act. On December 13, 1901, an ordinance, which is the sole basis of such contract, was enacted, as follows:

"An ordinance—providing for the letting of a contract or contracts for the work necessary to be done for the purpose of the extension and improvement of water supply and distribution, and including the filtration of such water supply.

"Section 1. Be it ordained and enacted by the city of Pittsburg, in select and common councils assembled, and it is hereby ordained and enacted by the authority of the same. That the city recorder and the director of the department of public works shall be and are hereby authorized and directed to let a contract or contracts for the work necessary to be done for the purpose of the extension and improvement of water supply and distribution, and including the filtration of such water supply, for a sum not to exceed one million five hundred thousand dollars ($1,500,000.00) or so much thereof as may be necessary to construct so much of the filtration plant for the city of Pittsburg as is shown upon the drawings and description in the specifications as and to be known as contract No. 1 to the lowest responsible bidder or bidders, and enter into a contract or contracts with the successful bidder or bidders for the performance of the work, in accordance with an act of assembly entitled, 'An act for the government of cities of the second class,' approved the 7th day of March A. D. 1901, and the different supplements and amendments thereto, and the ordinances of councils in such cases made and provided.

"Sec. 2. That any ordinance or part of ordinance, conflicting with the provisions of this ordinance, be and the same is hereby repealed, so far as the same affects this ordinance."

It is contended that the report of the filtration commission constituted such an estimate as the act required. In 1896 that commission was created to examine and report on the subject of a water supply for Pittsburg. The commission called to its aid competent experts, examined plants here and abroad, and subsequently made an exhaustive report to councils, recommending the construction of a filtration plant, the adoption of a meter system therewith, and gave estimates of cost. The report evidences a systematic and intelligent consideration of the subject and its conclusions and recommendation deserve high regard. But we cannot overlook the fact that this

report, in existence when the act was passed, is not made by such act the basis upon which the city may contract, and, highly as we personally regard it, we cannot judicially adjudge it an "estimate of the whole cost, furnished by the proper officer through the department having charge of the improvement." Other than this report it is not proved that any estimate of the cost of the whole of the proposed improvement was furnished councils by the department director, or was any estimate made by him of the part of the improvement included in the present contract and submitted to councils. It is true the engineers furnished to the director estimates of the parts of the work embraced in this contract, but they were furnished after the ordinance was passed. It will be noted that the present contract provides for the construction of sedimentation basin, filters, force main, and conduits, or the filtration plant proper. The intake pumping machinery to carry the water to such plant and the tunnel to carry the filtered product under the river to the Brilliant pumping station have not been estimated to councils, and, of course, no estimate of their cost has been considered by councils and made the basis of future contracting for their construction. So, also, no estimate has been made to councils of the land upon which the plant will be located. These elements are, singly and collectively, absolutely necessary to the use of the filtration section, and they, as well as the land, must, under any view, be deemed parts of the filtration plant, and, as such, regarded as proper subjects of estimate and consideration at the same time. But, apart from these elements, which are physically connected with and a part of the filtration plant, the necessity for an estimate of the cost of the filtration improvement or system as a whole, and the adoption of the estimate of the whole as the subject of and basis for future contracts, is strikingly illustrated by the facts disclosed in the report of the filtration commission in reference to an accompanying meter system. Such meter system, though not physically connected with the filtration plant, is by such report deemed a necessary and indispensable factor to the practical use of a filtration plant. That such is the case is shown by the report. To illustrate: It is therein shown that in 1883 the quantity of city water used averaged 157 gallons daily per person. This amount, certainly ample in quantity, has steadily increased, owing to uncontrolled waste, until in 1897 it reached 233 gallons daily per person. If the past is an index of the future, it is evident that this waste will continue to increase in quantity; and the water wasted will be more costly to the city, because it will be a waste of filtered instead of unfiltered water, as at present. In view of this the commission say, and their words should command grave consideration:

"Should the present unrestricted use of water be allowed to continue, a filter plant as proposed will have been outgrown almost before it is completed, and additions will require to follow each other on a scale, and with the frequency, which can hardly be estimated."

If this reasoning be correct, and no one who has made a study of public water supply can question the general principle here stated, the construction of a filtration plant on the scale proposed in the

present contract must be followed by others, unless the meter sys-. tem is employed. When, then, the city contracts for a filtration plant, it faces the alternative of adding additional filter plants hereafter or of restricting consumption by a meter system. The present contract provides for a filtration system, but by the action of the councils there is nothing to show, either in plan or estimate, which course is to be followed,—whether these filtration plants are the forerunners of others, or whether the meter system shall be adopted. The statement of these facts, based wholly on the report of the commission, is a demonstration of the correctness of the construction we place upon the act; namely, that the estimate on which any part of a proposed public improvement is based should be an estimate of cost, based on the whole improvement. In the absence of such estimate as a foundation for the present contract, no one can say whether the city, in contracting for the filtration plant provided in Contract No. 1, is beginning a public improvement consisting of this filtration plant alone, with a meter system that will render it ample for the city's needs, or whether this filtration plant, without a meter system, is to be outgrown before it is completed, and is, therefore, but the first of a series. We deem it proper to say we understand from the statements made at the hearing that the intention is to supplement the filtration plant with the meter system, which the report of the commission shows can be gradually added, and with the result of lowering present water rates, and not to embark the city in the construction of a series of such filtration plants without the meter system. If such be the case there should be no uncertainty as to the scope of the improvement the city is undertaking, and there will be none if its contracts are based "upon estimate of the whole cost, furnished by the proper officers through the department having charge of the improvement." That these provisions are obligatory, basic to the city's contractive power, and mandatory, we have no hesitation in holding; and this view finds support in Hepburn v. City of Philadelphia, 149 Pa. 340, 24 Atl. 279; Malone v. Same, 147 Pa. 420, 23 Atl. 628; City of Pittsburg v. Walter, 69 Pa. 365, and Reading City v. O'Reilly, 169 Pa. 369, 32 Atl. 420. If the improvement is such that the statutory estimate of the whole cost can be made, the legislature has said it must be made, and it alone shall be the basis of contract. If the improvement is such that no estimate can be made, then the legislature has not given the city the power to contract. As the contract before us was not based on the statutory estimate, the legal question involved must be decided against the city. Let a decree be prepared enjoining the letting of the contract.